UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br>    v.<br>JUSTIN JACKSON,<br>        Defendant. | Criminal No. 10-10409-PBS |

**MEMORANDUM AND ORDER**

October 22, 2014

Saris, U.S.D.J.

Defendant Justin Jackson is a federal prisoner seeking to vacate his convictions and set aside his guilty plea in light of the troubling scandal surrounding chemist Annie Dookhan and the William F. Hinton Drug Laboratory in Jamaica Plain. Jackson argues that his plea was invalid because the government failed to inform him of Dookhan's misconduct before he pleaded guilty. (Docket No. 30). Had he known about the scandal, Jackson insists that he would not have pleaded guilty, especially because Dookhan was involved in analyzing the drug samples in his case. The government opposes Jackson's motion and has requested summary dismissal. (Docket No. 68). For the following reasons, Jackson's Motion to Vacate Conviction and Withdraw Plea is **DENIED**. The government's request for summary dismissal is **ALLOWED**.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Jackson seeks to set aside his convictions for two related drug trafficking offenses: one count of distributing cocaine within 1000 feet of a school in September 2010; and one count of possessing cocaine with intent to distribute in October 2010. The facts underlying these incidents are largely undisputed.

Jackson's first conviction stems from two bags of crack cocaine that he sold to an undercover police officer on September 18, 2010. While walking through the South End of Boston, the undercover made eye contact with Jackson and asked him if "anyone was around." Jackson asked what the officer wanted, and the officer said he "needed two for thirty." Jackson then asked if the officer wanted "Flav," a common street term for crack cocaine. After the undercover said yes, Jackson said, "Yeah, I'll hook you up," and instructed the officer to meet him in a nearby alley.

The undercover went to the alley to wait for Jackson. When Jackson arrived, the undercover handed him $30 in recorded bills in exchange for two plastic bags containing white rock-like substances. As they walked out of the alley, the undercover asked Jackson for his name and telephone number. Jackson told the officer to "call me L" and gave the officer his phone number. The undercover then dialed the number in Jackson's presence, watched as Jackson's phone rang, and left the area. Shortly after the

transaction was completed, the police field tested the contents of one of the bags, which tested positive for crack cocaine. Police later confirmed that the location of the deal was less than 1,000 feet from a school.

Jackson's second drug conviction relates to thirteen bags of crack cocaine recovered by police when he was arrested on October 26, 2010. After obtaining an arrest warrant, the police arrested Jackson at the same intersection in the South End where the drug buy with the undercover had taken place just one month earlier. During booking procedures, the police noticed a slit cut into Jackson's pants near the zipper area. When they frisked Jackson and touched his lower back, Jackson then tightened up. The police told Jackson that they believed he had drugs in his underwear and asked him to give them up. Jackson confessed that he had drugs and removed 13 bags with white rock-like substances from the back of his underwear and gave it to the police. The contents of the bags again field-tested positive for crack cocaine.

The evidence from these two incidents next went to the Hinton Drug Laboratory in Jamaica Plain, former workplace of chemist Annie Dookhan. Dookhan was assigned as the primary chemist for the two bags of suspected crack cocaine from the September 2010 drug buy. As the primary chemist on the case, Dookhan's job was to visually examine the substance, document the gross and net weights, and perform all presumptive tests,

including reagent spot/color and microcrystalline tests. Dookhan was also responsible for keeping both bags of suspected crack cocaine locked in her personal lab cabinet. After completing the initial analysis, Dookhan prepared a small sample of the substance to be given to a confirmatory chemist, who in this case was Kate Corbett. Corbett's responsibility as confirmatory chemist was to run the sample through a gas chromatography-mass spectrometer (GC/MS) machine. After analysis was complete, the lab returned a certificate signed by Dookhan and Corbett stating that the substance in the bags contained cocaine.[1]

Meanwhile, the thirteen bags from Jackson's arrest were assigned to chemist Della Saunders. As the primary chemist, Saunders tested two of the thirteen bags and found that they contained cocaine. She then sent a small sample to Dookhan, who served as the confirmatory chemist tasked with running the sample through the GC/MS machine. According to an affidavit signed by Saunders, Dookhan did not have access to the thirteen bags of suspected crack cocaine while she operated the GC/MS machine because Dookhan served only as the confirmatory chemist. Gov't Request for Summary Dismissal Exh. 9 ¶ 9. Rather, Saunders kept the evidence in her locked cabinet and only gave a small sample of the substance to Dookhan. Id. The lab returned a certification

---

[1] No test for cocaine base was performed.

signed by Saunders and Dookhan stating that the bags tested positive for cocaine.[2]

On April 22, 2011, Jackson pleaded guilty to these two charges. At the plea hearing, he did not disagree with the government's allegations that he had sold cocaine to the undercover officer in September 2010. He also admitted that he possessed cocaine on the day of his arrest in October 2010, which he intended to sell. At one point, the Court specifically asked Jackson, "[W]as this crack?" and he responded, "Yes." The Court sentenced Jackson to 37 months of imprisonment and six years of supervised release on August 11, 2011.

A year later, Massachusetts was stunned by the news that chemist Annie Dookhan had falsely certified drug test results and tampered with samples at the Hinton Drug Lab. Although there was no direct evidence that Dookhan had committed any wrongdoing with respect to this case, Jackson filed his 28 U.S.C. § 2255 motion, (Docket No. 30), which was stayed at the parties' request until the Massachusetts Inspector General (OIG) released its report following an investigation of the lab. (Docket No. 31, 33). This report was released on March 4, 2014, and states, in relevant part:

> Dookhan was the sole bad actor at the Drug Lab. Though many of the chemists worked alongside Dookhan for years, the OIG found no evidence that any other chemist at the Drug Lab committed

---

[2]Again no test for cocaine base was performed.

5

> any malfeasance with respect to testing evidence or knowingly
> aided Dookhan in committing her malfeasance. The OIG found no
> evidence that Dookhan tampered with any drug samples assigned
> to another chemist even when she played a role in confirming
> another chemist's test results.
> . . .
> [A]ll samples in which Dookhan was the primary chemist should
> be treated as suspect and be subject to careful review
> . . .
> [T]he OIG found no evidence to support treating cases in which
> Dookhan confirmed another chemist's results with any increased
> suspicion about Dookhan's involvement.

(Docket No. 72 at 9, 11). The government filed its opposition on October 5, 2014, (Docket No. 68). Jackson's motion to vacate is now ripe for resolution.

## LEGAL STANDARDS

Title 28 U.S.C. § 2255(a) allows for a prisoner to collaterally attack his sentence when it "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). The burden is on the petitioner to make out a case for relief under § 2255. Id.

Generally speaking, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984), overruled in part on other grounds by Puckett v. United States, 556 U.S. 129 (2009). But the First Circuit has held that § 2255 motions are "not necessarily a dead end" for prisoners who pleaded guilty. Wilkins v. United

States, 754 F.3d 24, 28 (1st Cir. 2014). For example, "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if is his claim is based on evidence not available to him at the time of the plea." Ferrara v. United States, 456 F.3d 278, 289 (1st Cir. 2006).

To prevail on this ground, a defendant must make two showings. "First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea." Id. at 290. "Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." Id. To satisfy this second prong of materiality, a defendant must establish "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." Ferrara, 456 F.3d at 294.

"In mounting an inquiry into these elements, a court must consider the totality of the circumstances surrounding the plea." Ferrara, 456 F.3d at 290. Relevant factors include, but are not limited to, whether the withheld information: (1) would have detracted from the factual basis used to support the plea; (2)

7

could have been used to impeach a witness whose credibility may have been outcome-determinative; (3) was cumulative of other evidence already in the defendant's possession; (4) would have influenced counsel's recommendation as to the desirability of accepting a particular plea bargain; and (5) was outweighed by the benefits of entering into the plea agreement. Id. at 294.

Wilkins is a recent § 2255 case where Dookhan was the primary chemist analyzing a prisoner's drug samples. The First Circuit said that the defendant must "convince us that there is a reasonable probability that, considering the totality of the circumstances, he would not have pleaded guilty had he known of Dookhan's transgressions." 754 F.3d at 31. The Wilkins Court concluded that the defendant had not met this burden based on several factors. For starters, there was "powerful circumstantial evidence" of the defendant's guilt, and the "transaction followed the pattern of the prototypical street corner drug buy." Id. at 29. Also, the government had commissioned a second round of testing on samples that the district court found were untouched by Dookhan, which tested positive for cocaine. Id. These results "set to rest any real doubt about the nature of the merchandise purveyed by the petitioner." Id. Finally, the defendant had admitted his factual guilt in open court at the time he changed his plea, and he did not attempt to explain it away or make any assertion of factual innocence. Id. at 30. As a result, the Court

8

found that the defendant had not satisfied the Ferrara materiality standard.

## **DISCUSSION**

This case and Wilkins are like two pleas in a pod. Jackson is arguing that he would not have pleaded guilty if he had known about Dookhan's misconduct. But there are a number of reasons why this assertion is dubious. As a result, the Court finds that Jackson cannot establish the materiality of the alleged government misconduct.[3]

To begin with, Jackson has not argued that the substance he sold and possessed was, in fact, something other than cocaine. Nor, on this record, could he. At his change of plea hearing, Jackson admitted in open court that he had been in possession of cocaine and sold it to the undercover officer in exchange for money. He also admitted to possessing cocaine with the intent to sell it on the day of his arrest. The Court asked Jackson specifically, "[W]as this crack?" and he responded under oath, "Yes." These admissions are "entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack." Id. at 30. "And such an admission is especially compelling because the petitioner neither attempts

---

[3]Because Jackson fails to satisfy Ferrara's materiality prong, it is unnecessary to decide whether the government's alleged misconduct constituted "egregiously impermissible conduct" under Ferrara's conduct prong. 456 F.3d at 290.

to explain it away nor makes any assertion of factual innocence." Id.; see also United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994) (explaining that the absence of a claim of innocence "cuts sharply against allowing [a defendant's] motion to withdraw his guilty plea").

Beyond that, the evidence of Jackson's guilt facing him at trial is overwhelming. Police officers at the controlled drug buy and at Jackson's arrest identified the substance in the bags as cocaine, and field tests conducted by the officers returned positive results for cocaine as well. These observations all took place before the drug samples were sent to the Hinton Drug Lab.

Jackson's conduct was also consistent with the actions of a drug dealer who believed he was selling real cocaine instead of a knock-off imitation. When the undercover officer asked Jackson for "2 for 30," Jackson immediately asked if the officer wanted "Flav," which was a common street name for crack cocaine. Most telling, Jackson was also willing to give the undercover a name and telephone number, and the police found Jackson at the same street corner in the South End one month later when they arrested him. These facts suggest that Jackson had no fear his customers would be disappointed with their purchases.

Similarly, on the day of his arrest, the police told Jackson they suspected he had drugs, and he admitted to it before handing over thirteen bags of crack cocaine. At no time has Jackson

produced any evidence that he was carrying or selling only fake drugs or was otherwise actually innocent.

On top of all this, the government could also present evidence from Jackson's arrest on August 6, 2010, which was submitted as relevant conduct at sentencing. That day, the police observed two men approach a green car in the parking lot of a CVS Pharmacy in the South End (a three minute drive from the location of the two charged offenses). The police then saw the men make an exchange with Jackson and walk away from the vehicle. As a result, the police stopped the men, who said they had just purchased four bags of crack cocaine from Jackson. One of the bags was recovered, while the other three were swallowed as the men fled from the police. Officers then stopped the car and arrested Jackson. The police again noticed a slit cut behind the zipper area of Jackson's pants and recovered 21 bags containing white rock-like substances and two bags of marijuana. The substances in the 21 bags were identified by police as crack cocaine and sent to the Hinton Drug Lab, where Della Saunders was the primary chemist and Annie Dookhan was the confirmatory chemist. The lab returned a certificate finding that the bags tested positive for cocaine. Regardless of the trustworthiness of these results, the serial nature of Jackson's sales and his customer's expectations that they were buying crack cocaine suggest that Jackson was dealing real drugs.

Finally, there is no reasonable probability that Jackson would proceed to trial when the government can present drug test results from evidence that was never touched by Dookhan. The Court recognizes that the two bags of cocaine analyzed by Dookhan in her role as primary chemist are suspect, given that she may have tampered with the bags while they were in her possession. But this case also involved thirteen bags of cocaine where Dookhan served not as the primary chemist, but only as the confirmatory chemist for Della Saunders. According to Saunders's affidavit, she retained possession of all thirteen bags of crack cocaine from the time the case was assigned to her until she returned it to the evidence office following the completion of testing. Dookhan's only interaction with the case involved running the sample provided by Saunders through the GC/MS machine. The OIG also "found no evidence to support treating cases in which Dookhan confirmed another chemist's results with any increased suspicion about Dookhan's involvement." (Docket No. 72 at 11). Meanwhile, Jackson has presented no allegations or evidence suggesting that the testing conducted by Saunders should be considered suspect.

The Court recognizes that the OIG report also revealed a number of systematic problems at the Hinton Drug Lab, including (1) lax lab security; (2) gaps in chain-of-custody documentation; and (3) failure to disclose when chemists would run a sample

12

through the GC/MS machine multiple times because of inconsistent findings. But there is no evidence to suggest that these problems affected the results in Jackson's case. In fact, the government submitted the GC/MS control cards from Jackson's case, both of which show that the confirmatory testing was done on the GC/MS machine only once. Gov't Request for Summary Dismissal Exh. 15.

To put any doubts to rest, the government has also retested the drugs recovered from the September 2010 drug buy and the October 2011 arrest, and these results have all come out positive for cocaine. See Gov't Request for Summary Dismissal Exh. 13-14. The results from the October 2011 arrest are particularly significant because the government tested bags that had never previously been opened for analysis by anyone-including Dookhan, Saunders, Corbett, and the police. See Gov't Request for Summary Dismissal Exh. 12 (police report observing that 10 of the 13 bags appeared to be in their original packaging and never opened). As a result, there is little doubt that Jackson was in possession of authentic cocaine on the day of his arrest in October 2010.

In sum, this case turns on whether Jackson can establish a reasonable probability that he would have decided to go to trial instead of plead guilty had he known of the scandal involving Dookhan and the Hinton Drug Lab. After evaluating the totality of the circumstances, the Court finds that knowledge of the scandal would not have affected Jackson's calculus of the costs and

benefits of pleading enough to satisfy Ferrara's materiality prong. For the reasons stated above, Jackson has not established a reasonable probability that he would have proceeded to trial instead of pleading guilty had he known of the Hinton Drug Lab scandal.

## ORDER

Jackson's Motion to Vacate Conviction and Withdraw Plea is **DENIED**. The government's request for summary dismissal is **ALLOWED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge